# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# NORTHEASTERN DIVISION

TIFFANY TATUM, by and through
her mother and next friend TONIE
TATUM,

    PLAINTIFF,

VS.                                   CASE NO.: CV-06-J-2331-NE

MICHAEL J. ASTRUE,
Commissioner of Social Security,

    DEFENDANT.

## MEMORANDUM OPINION

This matter is before the court on the record and the brief of the plaintiff.[1] This Court has jurisdiction pursuant to 42 U.S.C. § 405. The plaintiff is seeking Supplemental Security Income (SSI) based on plaintiff's diagnoses of bipolar disorder, ADHD, and others. On appeal, the plaintiff argues that she meets Listings 112.03, 112.04, and 112.08.

The plaintiff[2] filed an application for SSI on June 25, 2004 (protective filing date), when she was 12 years old (R. 34-35, 87-95). That application was denied and a hearing in front of an administrative law judge (ALJ) was subsequently held on February 2, 2006 (R. 36-38, 289-314). The ALJ thereafter rendered an opinion

---

[1]On October 1, 2007, the court granted the Commissioner's motion for an additional thirty (30) days to file a brief. That time has expired without any brief from the Commissioner being received.

[2]For purposes of this opinion, "plaintiff" refers to the minor, Tiffany Tatum.

finding that the plaintiff was not under a disability at any time through the date of his decision (R. 19-31).

The plaintiff requested administrative review of the ALJ's decision by the Appeals Council, which denied the request for review on September 7, 2006 (R. 4-6). The ALJ's decision thus became the final order of the Commissioner of Social Security. *See* 42 U.S.C.§ 405(g). This action for judicial review of the agency action followed (doc. 1).

The court has considered the record and the arguments of the plaintiff. For the reasons set forth herein, the decision of the Commissioner is **REVERSED**.

## Factual Background

The plaintiff was born November 11, 1992, and was in the seventh grade at the time of the hearing (R. 294). She attended regular classes in school, but had special education assistance within her mainstream classroom (R. 294-295). The plaintiff's mother stated the plaintiff had problems focusing on her work and was depressed (R. 296). The plaintiff had been twice hospitalized for psychiatric problems at the time of the hearing (R. 298). She had outbursts over simple things, threw things at her mother, was unable to stay focused on anything, had lost interest in many of the things she did for fun, hit her mother, and had been suspended from school multiple times for fighting (R. 298-300). Several weeks before the hearing the plaintiff called

the police because of a "scuffle" with her mother, then was arrested for "get[ting] smart with them" (R. 300).

Plaintiff's first psychiatric hospitalization lasted two weeks (R. 301). The plaintiff was prescribed medication for bipolar disorder and ADHD, and hallucinations were noted (R. 301, 309). In her mother's opinion, the plaintiff was worse after this hospitalization than before it (R. 303). The plaintiff's mother stated the plaintiff did not have a boyfriend but "talks on the phone to guys – " (R. 304). The plaintiff disagreed and told the ALJ she did have a boyfriend who was a 15 or 16 year old school drop out that she met at juvenile court (R. 304-305). The plaintiff was again hospitalized several weeks later because her mother wanted her medication back on track, and hospital staff told the mother to file "an unruly charge against Tiffany for attitude problem" (R. 307).

Both Tiffany and her mother testified that the medication does not help (R. 307-308). The plaintiff admitted she poked herself with needles and cut herself with a comb, and agreed that this hurt but explained she did this because she was depressed (R. 305-306). The plaintiff's mother testified that at home the plaintiff would throw things and had broken things (R. 312).

The plaintiff testified that she was doing well in literature at school (R. 311). She stated she had friends but could not spend time with them because she could not go anywhere (R. 311). Her mother said she did not have a lot of friends and when

friends did come over, they usually argued (R. 312). The plaintiff responded that her mother did not know most of her friends from school (R. 312).

Medical records from February 1999, when the plaintiff was in kindergarten, reflect that she had suffered from behavior problems and "hyperness" for about two years (R. 160). These records show that she has been prescribed medication for ADHD since at least February 2001 (R. 145). At that time, her doctor noted that she had behavior problems in school, but that Concerta was helping (R. 145). A March 2001 record reflects that the plaintiff was being prescribed Adderall, and at some point Concerta was tried instead (R. 144). An April 2001 medical record reflects that her mother reported the plaintiff to be "defiant" (R. 143). A record from May 7, 2001, notes that the plaintiff had behavior problems (R. 142). However, in November 2001, the plaintiff was noted to be doing well at school and at home (R. 139).

A March 22, 2001, letter from plaintiff's teacher states that the plaintiff had "great difficulty" completing work and that her grades suffered because of it (R. 214). The teacher asserted that the medication helped the plaintiff focus and stay in her seat, but that she still had difficulty working on anything for more than 10 or 15 minutes and getting along with her peers and teachers (R. 214). An intelligence test in March 2003 found the plaintiff to fall in the borderline intelligence range (R. 217). Her articulation and language skills were noted to be age appropriate (R. 218).

In August 2002 the plaintiff was noted to have done well with Concerta (R. 227). A September 2003 medical record stated that the plaintiff was in the fifth grade and doing well (R. 222).

The plaintiff was sent for a psychological consultative examination in August 2004 (R. 231). The plaintiff's mother reported that the plaintiff had problems with attention and behavior since first grade (R. 231). At that time, the mother related that the plaintiff's behavior improved greatly with ADHD medication, and that the plaintiff's teachers reported significantly improved behavior (R. 232). The examiner concluded that the plaintiff fell within the borderline intellectual range, that ADHD was an appropriate diagnosis, and assigned a GAF of 53 (R. 233).

Plaintiff's September 2004 medical records reflect that she was no longer doing well in school, had falling grades, had relationship problems with friends, did not listen at home, and had been "somewhat emotional" (R. 263). Her Concerta dosage was increased (R. 263). A medical record from September 2005 states that the plaintiff had not been doing well at school and her medication was switched from Concerta to Focalin (R. 260).

The plaintiff was admitted for psychiatric hospitalization three times between December 7, 2005, and February 11, 2006 (R. 241-248, 252-256, 282-288). The first admission record, beginning December 7, 2005, reflects that the plaintiff was admitted due to increasing aggression and suicidal ideation with self-mutilation (R.

5

241, 245). The plaintiff was diagnosed as manic, with bipolar disorder and ADHD, and a variety of medications were prescribed (R. 241-242). She reported that over the past few years she had more unstable moods, bouts of auditory and visual hallucinations, had been suspended from school for fighting and had problems at home (R. 244-245). Upon admission, her GAF was 40 (R. 245). When she was no longer having suicidal or homicidal ideation, the hospital opined that "she no longer met her insurance company's criteria for continued inpatient stay" and it was also felt that she was reasonably safe enough to return to a close outpatient followup (R. 241). Hence, the plaintiff was released on December 19, 2005 (R. 241). At the time of this discharge, her GAF was listed at 60 (R. 242).

The plaintiff was readmitted from January 4, 2006, though January 6, 2006 (R. 252). The plaintiff was again placed on suicide precautions as she had threatened to harm herself and her mother (R. 252, 254-255). She was self-mutilating, threatening and grandiose, and reported that she would kill herself if she went home (R. 254). Her medication was again adjusted (R. 252, 256). Upon discharge, the plaintiff was noted to still be having grandiose feelings, but her initial threats of harming herself and others were "felt to be more manipulative than anything else" (R. 252). Her GAF upon discharge was 45 (R. 252).

The plaintiff's mental health is followed by Michael Beddingfield, LCSW, for outpatient psychotherapy (R. 273, 284). His records reflect that the plaintiff

experienced numerous episodes of anger, outbursts, rebelliousness, oppositional behavior, and was currently facing charges in Limestone County Juvenile Court (R. 273). She was still cutting on herself and believed she could manipulate the hospital staff (R. 273). Mr. Beddingfield completed paperwork for the plaintiff's claim for benefits after conferring with Dr. Sprinkle (R. 273).[3] Mr. Beddingfield also found that the plaintiff was threatening violence to her friends and family (R. 275). Her affect was "hyper," her judgment and insight "poor," her thought content was "rapid, unfocused," with suicidal talk and thoughts (R. 275). She had resisted taking her medication, had been suspended from school for fighting, and was irrational (R. 275).

Dr. Sprinkle's notes reflect the plaintiff's threats of killing herself (R. 278). He adjusted her medication and noted that Strattera helped (R. 278). However, in early February 2006 Dr. Sprinkle noted that the plaintiff's thoughts lacked cause and effect reasoning (R. 278). He discontinued Strattera and increased her other medications (R. 278).

The last psychiatric admission in the record was February 9, 2006, approximately one week after the hearing before the ALJ (R. 282). These records reflect that the plaintiff was readmitted for threatening to burn down her house and kill herself (R. 282). She was again placed on suicide precautions (R. 282). These

---

[3]Dr. Albert L. Sprinkle is the medical doctor who oversaw the plaintiff's treatment while she was hospitalized (R. 256).

records note that the plaintiff developed unstable mood symptoms approximately two years prior to this hospitalization (R. 284). Her conversation was noted to often make no sense (R. 285). The plaintiff's medications were again adjusted and her diagnoses upon discharge were bipolar disorder- manic episode, and conduct disorder (R. 282). Her GAF upon discharge was 55 (R. 283).

Mr. Beddingfield completed several opinion forms at the request of plaintiff's counsel, which reflect his belief that the plaintiff exhibits the criteria to meet Listings 112.04, 112.08, and 112.03 (R. 268-271).[4]

In his May 30, 2006, decision, the ALJ found that the plaintiff was not disabled at any time since June 25, 2004, the date her application was filed (R. 31). The ALJ found the plaintiff's hospitalizations in 2005 and 2006 essentially irrelevant since she had been doing well in school in 2004 (R. 25). He further opined that there was no evidence to indicate that the plaintiff's problems were sustained for a significant period of time (R. 25). The ALJ found the plaintiff to have less than marked limitations in acquiring and using information (R. 26), less than marked limitations in attending and completing tasks (R. 27), less than marked limitations in interacting and relating with others (R. 28), no limitation in moving about or manipulating

---

[4]The plaintiff mistakenly refers to Michael Beddingfield as a psychiatrist in her brief. *See* brief of plaintiff, at 10.

objects (R. 29), less than marked limitation in the ability to care for herself (R. 30), and less than marked limitation in health and physical well-being (R. 31).

## Standard of Review

This court's review of the factual findings in disability cases is limited to determining whether the record contains substantial evidence to support the ALJ's findings and whether the correct legal standards were applied. 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420 (1971); *Wolfe v. Chater*, 86 F.3d 1072, 1076 (11th Cir.1996); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir.1990). "Substantial evidence" is generally defined as "such relevant evidence as a reasonable mind would accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401 (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206 (1938)); *Miles v. Chater*, 84 F.3d 1397 (11th Cir.1996); *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir.1983).

In determining whether substantial evidence exists, this court must scrutinize the record in its entirety, taking into account evidence both favorable and unfavorable to the Commissioner's decision. *Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir.1988); *Walker v. Bowen*, 826 F.2d 996, 1000 (11th Cir.1987). "Even if the Court finds that the evidence weighs against the Commissioner's decision, the Court must affirm if the decision is supported by substantial evidence." *Allen v. Schweiker*, 642 F.2d 799, 800 (5th Cir.1981); *see also Harwell v. Heckler*, 735 F.2d 1292 (11th Cir.1984);

*Martin v. Sullivan*, 894 F.2d 1520 (11th Cir.1990). This court must also be satisfied that the decision of the Commissioner is grounded in the proper application of the appropriate legal standards. *McRoberts v. Bowen*, 841 F.2d 1077, 1080 (11th Cir. 1988); *Bridges v. Bowen,* 815 F.2d 622, 624 (11th Cir.1987); *Davis v. Shalala*, 985 F.2d 528 (11th Cir. 1993). This court may not decide facts anew, reweigh evidence or substitute its judgment for that of the ALJ, even if the court finds that the weight of the evidence is against the Commissioner's decision. *Martin*, 894 F.2d at 1529. However, no such presumption of correctness applies to the Commissioner's conclusions of law, including the determination of the proper standard to be applied in reviewing claims. *Brown v. Sullivan*, 921 F. 2d 1233, 1235 (11th Cir. 1991); *Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991).

The test to be applied for whether a child may be considered disabled is as follows:

> An individual under the age of 18 shall be considered disabled for the purposes of this subchapter if that individual has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. § 1382c(a)(3)(C)(i). A "physical or mental impairment" is "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically accepted clinical and laboratory diagnostic techniques."

10

42 U.S.C. § 1382c(a)(3)(D).  In determining the severity of all impairments, the Commissioner must consider the combined effect and combined impact of all of the individual's impairments.  42 U.S.C. § 1382c(a)(3)(G).

The regulations further set forth steps to be used to determine disability for children.  20 C.F.R. §416.924.

> If you are doing substantial gainful activity, we will determine that you are not disabled and not review your claim further.  If you are not doing substantial gainful activity, we will consider your physical or mental impairment(s) first to see if you have an impairment or combination of impairments that is severe.  If your impairment(s) is not severe, we will determine that you are not disabled and not review your claim further.  If your impairment(s) is severe, we will review your claim further to see if you have an impairment(s) that meets, medically equals, or functionally equals the listings.  If you have such an impairment(s), and it meets the duration requirement, we will find that you are disabled.  If you do not have such an impairment(s), or if it does not meet the duration requirement, we will find that you are not disabled.

20 C.F.R. § 416.924(a).  Age, functioning, and other factors are evaluated in determining whether a child meets a listing.  20 C.F.R. § 416.924a-416.924b.  A child's limitations "meet" the limitations in the Listings if the child actually suffers from the limitations specified in the Listings for that child's severe impairment.  *Shinn v. Commissioner of Social Security*, 391 F.3d 1276, 1279 (11th Cir.2004); *citing* 20 C.F.R. § 416.926(a)(2).

If a child's impairments do not meet a listed impairment, the Commissioner will assess all functional limitations caused by the child's impairments to determine whether the functional limitations are "functionally equivalent" to those in the Listings.  *Shinn*, 391 F.3d at 1279.  *See also* 20 C.F.R. §416.926a.

The regulations define the term "marked and severe functional limitations" as "a level of severity that meets, medically equals, or functionally equals the listings." 20 C.F.R. § 416.902.  In making this determination, the ALJ must assess the degree to which the child's limitations interfere with the child's normal life activities in six specific domains:

> (1) acquiring and using new information
> (2) attending and completing tasks
> (3) interacting and relating to others
> (4) moving about and manipulating objects
> (5) caring for oneself
> (6) health and physical well-being.

20 CFR § 416.926a(b)(1).  An impairment "functionally equals the Listings if, as a result of the limitations stemming from that impairment the child has "marked limitations" in two of the domains or an "extreme limitation" in one domain.  *Shinn*, 391 F.3d at 1279, citing 20 C.F.R. § 416.926a(d); § 416.925(a).  There is also a duration requirement that the impairment has lasted or can be expected to last for a continuous period of not less than 12 months.  20 C.F.R. § 416.906.

## Legal Analysis

The court is of the opinion the conclusions of the ALJ could only be reached by ignoring all evidence from September 2004 through the date of his decision. The evidence of record reflects that the plaintiff did not complete tasks, was doing poorly in school, had suicidal and homicidal thoughts, fought with everyone, had been suspended from school, and was facing juvenile charges. Ignoring all of this information, the ALJ instead chose to rely on a Function Report completed by the plaintiff's aunt almost two years prior to the date of his decision (R. 27). Similarly, based on the hearing testimony of the plaintiff, the ALJ determined the plaintiff has a "boyfriend," and that she got along with her teachers based on the Function Reports completed by the plaintiff's mother and aunt, again two years prior to the hearing (R. 28, 102-119). The interceding suspension from school, arrest and three psychiatric hospitalizations are not mentioned by the ALJ in considering how the plaintiff interacts and relates to others (R. 28). Yet again, in considering the plaintiff's abilities to care for herself, the ALJ relies on the Function Reports completed by the plaintiff's aunt and mother (R. 102-119), while wholly ignoring the references in medical records to plaintiff being self-mutilating, suicidal and refusing to take her medication (R. 30).

The ALJ simply ignored the majority of the medical evidence in the record. The ALJ relied on reports of the plaintiff's aunt and mother completed in 2004 rather than considering any medical records, including those showing the plaintiff's ever-increasing problems, from 2004 through the date of his decision. Given this, the court is unable to conclude that the decision of the ALJ is supported by substantial evidence.

The court is of the opinion that, when all of the evidence of record is considered, the plaintiff does suffer from marked and severe impairments sufficient to meet Listing 112.04. That Listing requires both parts A and B to be met, as follows:

> A. Medically documented persistence, either continuous or intermittent, of one of the following:
> ...
> 2. Manic syndrome, characterized by elevated, expansive, or irritable mood, and at least three of the following:
> a. Increased activity or psychomotor agitation; or
> b. Increased talkativeness or pressure of speech; or
> c. Flight of ideas or subjectively experienced racing thoughts; or
> d. Inflated self-esteem or grandiosity; or
> e. Decreased need for sleep; or
> f. Easy distractibility; or
> g. Involvement in activities that have a high potential of painful consequences which are not recognized; or
> h. Hallucinations, delusions, or paranoid thinking;
>
> AND

> B. ... for children (age 3 to attainment of age 18), resulting in at least two of the appropriate age-group criteria in paragraph B2 of 112.02 (as follows):
>
> ....
>
> b. Marked impairment in age-appropriate social functioning, documented by history and medical findings (including consideration of information from parents or other individuals...); or
>
> c. Marked impairment in age-appropriate personal functioning, documented by history and medical findings (including consideration of information from parents or other individuals).

20 CFR Pt. 404, Subpart P, App. 1, Listing 112.04.

The ALJ made no mention in his opinion of any consideration of this or any other Listing. However, the plaintiff's treatment records reflect flight of ideas, racing thought, grandiosity, involvement in activities that have a high potential of painful consequences which are not recognized, and hallucinations. This more than meets part A of this Listing. See 20 C.F.R. § 404.1526 (a mental impairment is medically equivalent to a listed mental impairment if the medical findings are at least equal in severity and duration to the listed findings).

Similarly, the plaintiff's medical records reflect marked impairment in age-appropriate social functioning, such as fighting with friends, being suspended from school, and being arrested. Marked impairment in age-appropriate personal functioning is documented by failing grades, believing she can take care of herself,

believing she could manipulate the hospital staff, and refusing to take medication or listen to parents or teachers.

The ALJ simply ignoring all medical records since 2004 does not eliminate the medical evidence that the plaintiff has been diagnosed as bipolar, with multiple manic episodes, that she is self-mutilating, hits her mother, threatens to kill herself and/or others, and has been suspended from school for fighting. The ALJ cannot arbitrarily reject uncontroverted medical testimony. *Walden v. Schweiker*, 672 F.2d 835, 839 (11th Cir. 1982); *see also Flynn v. Heckler*, 768 F.2d 1273, 1275 (11th Cir. 1995). Substantial weight must be given to the opinion, diagnosis and medical evidence of a treating physician unless there is good cause to do otherwise. *See Lewis v. Callahan*, 125 F.3d 1436, 1439-1441 (11th Cir.1997); *Edwards v. Sullivan*, 937 F.2d 580, 583 (11th Cir.1991); 20 C.F.R. § 404.1527(d). If a treating physician's opinion on the nature and severity of impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight. 20 C.F.R. § 404.1527(d)(2). Here, each of the medically diagnosed and documented problems falls within the criteria for Listing 112.04.

Even if this plaintiff did not meet the above Listing, this court finds the plaintiff's limitations to be functionally equivalent to those in the Listing. The ALJ

did state that he considered each of the six domains. However, he failed to consider the evidence in the record as it applied to each of these domains, which amounts to an error of law. *See e.g., Owens v. Heckler*, 748 F.2d 1511 (11th Cir.1984) (stating the court must evaluate the Commissioner's findings "in light of the entire record, not only that evidence which supports [his] position"). The ALJ almost exclusively relied on the Function Reports of the plaintiff's aunt and mother completed two years prior to the hearing, over the more recent and unrefuted reports of Mr. Beddingfield and Dr. Sparkle to find that the plaintiff did not have marked limitations in any of these areas.

    Given the evidence, as set forth above, the court finds that the ALJ's opinion that the plaintiff does not have marked limitations in "attending and completing tasks," "interacting and relating with others" and "caring for yourself" to be against the great weight of the evidence. Since 2004 the plaintiff's grades have gone down to the point of failing. Concerning interacting and relating to others, the court finds that the evidence clearly established that the plaintiff fights, has been suspended from school, and has been arrested. In January 2006 Mr. Beddingfield recorded that the plaintiff had "[n]umerous episodes of anger, outbursts, rebelliousness, oppositional behavior. Currently facing charges in Limestone Co. Juv. Court .... Still doing cutting on self" (R. 273). She has threatened harm to herself and others, and has used

various objects to cut herself, undercutting any finding of an ability to care for herself.

Given the above evidence, which was before the ALJ, the court finds the ALJ's opinion that the plaintiff does not have limitations in the domains of "attending and completing tasks," "interacting and relating with others" and "caring for yourself" to be against the great weight of the evidence. The court finds that the plaintiff does suffer from at least marked limitations in each of the above areas. Therefore, the court finds that the plaintiff is entitled to a finding of disability. The ALJ's decision to the contrary was against the substantial weight of the evidence in the record.

## Conclusion

Based upon a consideration of all of the evidence and the memorandum of law of the plaintiff, this court finds that the decision of the ALJ is based on an error of law. Therefore, the court **REVERSES** the determination of the ALJ and **REMANDS** this case to the Commissioner to calculate the plaintiff's benefits.

**DONE** and **ORDERED** the 11th day of December, 2007.

INGE PRYTZ JOHNSON
U.S. DISTRICT JUDGE